# United States Court of Appeals
# For the Second Circuit

August Term 2025

Argued:  March 19, 2026
Decided:  August 6, 2026

No. 25-907

THE RETAIL PROPERTY TRUST,

*Plaintiff-Appellant*,

*v.*

NASSAU COUNTY DEPARTMENT OF ASSESSMENT, JAMES E.
DAVIS, as Acting County Assessor, THE NASSAU COUNTY
LEGISLATURE, THE COUNTY OF NASSAU,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of New York
No. 17-cv-2193, Joanna Seybert, *Judge.*

Before:  WESLEY, SULLIVAN, and MENASHI, *Circuit Judges*.

The Retail Property Trust (the "Trust"), which owns the Roosevelt Field Mall in Garden City, New York, appeals from the district court's grant of summary judgment in favor of defendants Nassau County and its acting assessor, department of assessment, and legislature (collectively, "Defendants") following the County's imposition of a $4.8 million fine on the Trust for failing to report its financial data as mandated by the County's Annual Statement of Income and Expenses ("ASIE") Law, Nassau County Administrative Code § 6-30.0.  The Trust argues that the ASIE Law – which requires commercial property owners to either share financial information with county assessors or pay a fine calculated as a percentage of the market value of the property – violates the Eighth Amendment's Excessive Fines Clause, the Fourteenth Amendment's Due Process Clause, and several state laws.  The Trust also contends that the district court wrongly denied its motion to sanction Defendants for mischaracterizing both the usefulness of ASIE data once collected and the extent of the County's data security protocols.

We agree with the district court (Seybert, *J.*) that the penalty imposed on the Trust was not constitutionally excessive, that the Trust received adequate procedural due process, and that the ASIE Law does not violate the Trust's substantive-due-process rights.  We also conclude that the district court did not abuse its discretion in declining to impose sanctions on Defendants.  We therefore **AFFIRM** the district court's judgment in full.

Judge Wesley concurs in a separate opinion.

AFFIRMED.

> JAMES T. SMITH (Danielle B. Gatto, Forchelli Deegan Terrana LLP, Uniondale, NY; Lewis W. Schlossberg, Blank Rome LLP, Philadelphia, PA, *on the brief*), Blank Rome, Philadelphia, PA, *for Plaintiff-Appellant*.
>
> JONATHAN A. SORKOWITZ (Alexander C. Haden, Withers Bergman LLP, New York, NY, *on the brief*),

2

Law Offices of Jonathan A. Sorkowitz, Chappaqua, NY, *for Defendants-Appellees*.

R<small>ICHARD</small> J. S<small>ULLIVAN</small>, Circuit Judge:

The Retail Property Trust (the "Trust") appeals from the district court's (i) grant of summary judgment in favor of defendants Nassau County (the "County") and its acting assessor, department of assessment, and legislature (collectively, "Defendants") and (ii) denial of the Trust's motion for sanctions. In a nutshell, the Trust challenges the County's ability to impose millions of dollars of fines for failure to comply with the County's Annual Statement of Income and Expense ("ASIE") Law, Nassau County Administrative Code § 6-30.0.

The ASIE Law requires commercial property owners either to share financial information with county assessors, so that they can accurately determine property values, or to pay a financial penalty, calculated as a percentage of the market value of the property. After the Trust – which owns the Roosevelt Field Shopping Mall in Garden City – failed to report its financial data as required by the ASIE Law for two consecutive years, the County fined it approximately $4.8 million. In response, the Trust sued Defendants, alleging that the ASIE Law violates the Eighth Amendment's Excessive Fines Clause, the Fourteenth

3

Amendment's Due Process Clause, and several state laws. It subsequently moved for sanctions.

The district court rejected the Trust's constitutional arguments, holding that the penalty at issue was not excessive, that the Trust received adequate procedural due process, and that the ASIE Law did not violate the Trust's substantive-due-process rights. It then denied the sanctions motion on the ground that the Trust had simply identified immaterial factual disputes – not egregious dishonesty or bad faith. Because we agree with the district court across the board, we affirm the judgment in full.

## I.   BACKGROUND

The amount of tax that property owners pay generally depends on the value of their property. In Nassau, county-level officials determine that value by assessing properties. Most of the property taxes collected go to other municipalities and taxing jurisdictions within the County. But if the County overvalues a property, resulting in the overpayment of taxes by the property owner to those various jurisdictions, the County alone is on the hook to refund the owner. Such "tax certiorari refunds became a significant liability [for] the County, costing approximately one hundred million dollars a year." Sp. App'x at 87.

4

To make assessments as accurate as possible – and thus ease its tax-refund burden – the County has long mandated that commercial property owners report ASIE information. In the mid-1980s, the County gave this ASIE-reporting requirement teeth: property owners who failed to provide their financial data upon request were fined $500. But while enhanced enforcement and the imposition of fines increased compliance with the reporting requirement, around 20% of property owners still refused to provide data.

In late 2013, the County updated the penalty structure of the ASIE Law, replacing the $500 flat fee with "monetary penalties ranging from 0.25% . . . to 0.75% of the fair market value of the property," depending on how long the property owner took to comply. *Id.* at 89 (internal quotation marks omitted). The new ASIE Law thus aims to "improve compliance" and "minimize assessment errors" that "lead[] to refund liability." *Id.* at 88–89.

Roosevelt Field is "the second-largest retail shopping mall in the State of New York[,] with over 2 million square feet of gross leasable space." J. App'x at 2619. The Trust received notice from the County of the new ASIE law. Nevertheless, it did not submit the required ASIE statements for 2013 and 2014. As a result, in 2016, the County informed the Trust that it was imposing $4,753,209

in civil penalties because of its failure to file ASIE statements for Roosevelt Field. *Id.* at 2629–30.

The Trust denies that it received any preliminary letters providing it with notice of the potential fine or an opportunity to cure or be heard as to its ASIE delinquency, as required by the ASIE Law and County regulations. *See* Nassau County Administrative Code § 6-30.0(f); Nassau County Department of Assessment's Rules for Income and Expense Statements § 4.0(a)(i), (ii). But once it *did* receive notice of the fine, the Trust did not pursue any remedies under the ASIE Law or challenge the fine by filing a petition in state court under Article 78 of New York's Civil Practice Law and Rules, N.Y. C.P.L.R. § 7803 ("Article 78"). Instead, the Trust filed this action in federal court, alleging that Defendants had violated the U.S. Constitution's prohibition on excessive fines as well as its guarantees of procedural and substantive due process. The Trust also asserted claims under the New York State Constitution and Article 78.

After the close of discovery, both sides moved for summary judgment. The Trust also moved for sanctions, arguing that witnesses for Defendants had misleadingly described both the usefulness of the ASIE data and the County's data-security protocols. The district court referred all of these motions to

6

Magistrate Judge Anne Y. Shields, who recommended that the district court grant Defendants' motion for summary judgment and deny the Trust's motion for sanctions.

The district court agreed, concluding that (i) the fine was proportional to the Trust's offense; (ii) the Trust had received sufficient process because the availability of an "Article 78 proceeding [wa]s adequate to protect" its rights, J. App'x at 66 (internal quotation marks omitted); (iii) the ASIE Law did not violate the Trust's substantive-due-process rights because "[i]mproving the accuracy of assessments [wa]s conceivably a rational basis for th[at] legislative action," *id.* at 70; and (iv) Magistrate Judge Shields had "acted well within her discretion" in denying the Trust's sanctions motion, *id.* at 76. Finally, having knocked out all of the Trust's federal claims, the district court "decline[d] to exercise supplemental jurisdiction" over the state-law claims, which it dismissed without prejudice. J. App'x at 81; *see* 28 U.S.C. § 1367. The Trust timely appealed.

## II. DISCUSSION

"We review *de novo* a district court's decision to grant summary judgment," affirming only if, "construing the evidence in the light most favorable to the [non-moving] party . . . and drawing all reasonable inferences in that party's favor," we

7

conclude that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023) (internal quotation marks omitted).[1]  Meanwhile, "[w]e review the district court's denial of sanctions for abuse of discretion." *Kim v. Kimm*, 884 F.3d 98, 106 (2d Cir. 2018).

### A.    The Trust's Eighth Amendment Challenge Fails.

The Trust first contends that the ASIE penalty violated the Eighth Amendment's Excessive Fines Clause.  We disagree.

The Eighth Amendment prohibits "excessive fines."  *United States v. Viloski*, 814 F.3d 104, 108 n.3 (2d Cir. 2016) (quoting U.S. Const. amend. VIII); *see Timbs v. Indiana*, 586 U.S. 146, 150 (2019) (incorporating the Eighth Amendment against the states).  Because the parties here "do not dispute" that the ASIE penalty qualifies as a fine, Defs.' Br. at 29, the fate of the Trust's claim depends entirely on whether

---

[1] The parties dispute whether the district court should have reviewed the magistrate judge's underlying report and recommendation *de novo*, instead of merely for clear error.  We have recently explained that "[w]here a litigant's objections take issue with a specific legal conclusion in the report and recommendation, they should be considered *de novo*, even if they repeat an argument raised before the magistrate judge." *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 361 (2d Cir. 2025) (internal quotation marks omitted).  Regardless, for the reasons explained here, based on our own *de novo* review, we agree that Defendants were entitled to summary judgment.  And because we review the district court's decision *de novo*, any error by the district court as to the correct standard of review does not affect the disposition of this appeal. *See Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 121 (2d Cir. 2022).

(i) the Eighth Amendment protects corporate entities in the first place; and (ii) the fine here was "excessive." *Viloski*, 814 F.3d at 110 (citing *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

### 1. The Eighth Amendment protects corporations.

While "not all constitutional protections apply to corporations," such entities "may [still] assert" a "wide variety of constitutional rights." *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 346–48 (2d Cir. 2002). To distinguish between those "rights that may be asserted by corporations and those that may not," *id.* at 347, we must first determine whether the right at issue is a "purely personal guarantee" that has been historically "limited to the protection of individuals" or one that extends more broadly. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778–79 n.14 (1978) (internal quotation marks omitted). To answer that question, we consider the "nature, history, and purpose" of the asserted right. *Consol. Ed.*, 292 F.3d at 347.

Applying those factors here, we have little hesitation in concluding that the Eighth Amendment shields corporations as well as individuals from excessive fines. Indeed, we implied as much in *Consolidated Edison*, where we considered whether Article I's Bill of Attainder Clause protects corporations. *See id.* In

9

determining that it does, we compared that clause – which prohibits "law[s] that legislatively determine[] guilt and inflict[] punishment upon . . . identifiable individual[s]," *id.* (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)) – to both the Excessive Fines Clause and the Fifth Amendment's Takings Clause. *Id.* at 348–49. We further explained that all of these constitutional provisions protect corporations because they aim to prohibit "punitive confiscation of private property," which is a "type[] of punishment" that "may injure a corporation in the same way it injures an individual." *Id.*

In reaching that conclusion, we endorsed Justice O'Connor's concurrence in *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, which "argu[ed] that . . . [the] Excessive Fines Clause applies to corporations." *Id.* (citing 492 U.S. 257, 284–85 (1989) (O'Connor, J., concurring in part and dissenting in part)). In particular, Justice O'Connor explained that "[t]he payment of monetary penalties, unlike the ability to remain silent, is something that a corporation can do as an entity." *Browning-Ferris*, 492 U.S. at 285. She further noted that the Supreme Court has historically "reviewed fines and monetary penalties imposed on corporations" and then concluded that "[i]f a corporation is protected by the Due Process Clause from [inordinate penalties], it is also protected from such penalties by the

10

Excessive Fines Clause." *Id.* By adopting this reasoning, *Consolidated Edison* strongly suggested that the Excessive Fines Clause protects corporations. And in more recent cases, we have simply assumed as much. *See, e.g.*, *New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 599 n.36 (2d Cir. 2019) (noting constitutional "constrain[ts]" of Excessive Fines Clause in case involving corporate defendant).

Defendants ignore this precedent, pointing instead to loose generalities about the clause's historical purposes, which "include protecting a person's livelihood and protecting against political reprisals." Defs.' Br. at 27. But those purposes come into play just as much for corporations – which may face political persecution and which help guarantee the livelihoods of their employees and investors. As we explained in *Consolidated Edison*, the Constitution's "protection[s] against targeted economic injury" are "fully applicable to corporations" because "if [such] protections did not extend to corporations," they "would be significantly undermined for individuals." 292 F.3d at 348. After all, "[w]hen a corporation suffers an economic injury, its shareholders suffer the same economic injury." *Id.* We therefore hold that the Excessive Fines Clause shields both individuals and

11

corporations from "overbearing and oppressive monetary sanctions." *Browning-Ferris*, 492 U.S. at 285.[2]

In his concurrence, Judge Wesley insists that because "we need not decide th[e Eighth Amendment] issue to resolve this appeal," we should "leave that question for another day." Concurrence at 1. But we *do* need to consider this issue in some capacity, either by directly resolving it or assuming without deciding it. *See id.* at 1 & n.1 (acknowledging that other courts have confronted the Eighth Amendment question by "assum[ing] without deciding" its answer, not by simply ignoring it). We therefore resolve this issue today and, in doing so, provide a final answer for the benefit of uncertain district courts.

The concurrence offers several reasons why we should duck this issue, but none of them is persuasive. *First*, the concurrence emphasizes that the magistrate judge below did not answer the Eighth Amendment question because of "the dearth of guidance on th[at]" issue. *Id.* at 1. The concurrence then urges us to do the same. But a magistrate judge's decision does not tie our hands, and the concurrence's overly deferential approach would establish a vicious cycle in which

---

[2] Other courts agree. *See Colo. Dep't of Labor & Emp. v. Dami Hosp., LLC*, 2019 CO 47M, ¶¶ 21–26 (Colo. 2019) (en banc); *Duling Enters., LLC v. Dep't of Lab. & Indus.*, 35 Wash. App. 2d 192, 200 (2025).

(i) we refuse to provide guidance because a lower court has declined to reach an issue; (ii) a future lower court sidesteps an identical issue precisely because of this "dearth of guidance"; and (iii) we then again refuse to reach the issue on appeal. Our job is to establish the precedent that the magistrate judge lacked here, not to dodge important legal questions at all costs. After all, "[t]here is a difference between judicial restraint and judicial abdication," *Citizens United v. FEC*, 558 U.S. 310, 375 (2010) (Roberts, *C.J.*, concurring), and it would be abdication rather than restraint to sidestep a recurring question that is squarely presented in this appeal. Indeed, as we have previously explained, we must "avoid restraint becoming lethargy and efficiency mere avoidance." *Browning-Ferris Indus. of S. Jersey, Inc. v. Muszynski*, 899 F.2d 151, 159 (2d Cir. 1990); *see also In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017) ("taking . . . opportunity to clarify the scope of" doctrine implicated by "threshold" issue).

*Second*, the concurrence contends that "the Trust is not a corporation but a Massachusetts business trust." Concurrence at 2. That is, however, a distinction without a difference. *See id.* at 2 n.3 (conceding that "[t]here may not be any reason to distinguish the Excessive Fines Clause's applicability to corporations from its applicability to Massachusetts business trusts"). The reasoning underlying our

holding applies equally to all business organizations for which "overbearing and oppressive monetary sanctions" would harm shareholders, beneficiaries, or similar parties in interest. *Browning-Ferris*, 492 U.S. at 285; *see also In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000) ("A court can choose among different holdings that offer broader or narrower ways of resolving a dispute.").

*Third*, the concurrence suggests, in passing, that this issue was "scarcely briefed." Concurrence at 2. But the record reflects that the parties actually briefed this question at every stage of this litigation. *See* Defs.' Br. at 17, 25–28; Reply Br. at 7–8; J. App'x at 2173–74; *id.* at 2201–03; *id.* at 2787–88 n.6. When litigants plainly contest a legal proposition, what matters is the quality of their arguments – not the raw number of lines they use to make them.

*Fourth*, the concurrence relies on the majority opinion in *Browning-Ferris* to reassert that (i) "we need not answer" the question of whether the Excessive Fines Clause protects business entities because (ii) the fine here was not excessive. Concurrence at 2–3 (quoting *Browning-Ferris*, 492 U.S. at 276 n.22 (majority opinion)). But *Browning-Ferris* does not suggest that we must first analyze whether a given fine is excessive before considering whether the Eighth Amendment applies at all. On the contrary, the Supreme Court in *Browning-Ferris* did *not*

14

address whether the fine at issue was excessive and instead held that the Excessive Fines Clause "does not constrain an award of money damages in a civil suit" between private parties. 492 U.S. at 264.

In other words, the majority in *Browning-Ferris* resolved *one* initial issue about the Eighth Amendment's scope, without needing to answer *other* threshold "questions that *otherwise might be necessarily antecedent*" parts of the analysis. *Id.* at 276 n.22 (emphasis added). For her part, Justice O'Connor determined that the Eighth Amendment *did* apply to civil punitive damages, and she therefore proceeded to the next "preliminary question[]" – *i.e.*, whether "corporation[s] . . . [are] protected by the Excessive Fines Clause." *Id.* at 283 (O'Connor, *J.*, concurring in part and dissenting in part). *Browning-Ferris* thus cuts directly against the concurrence's theory: both the majority and the concurrence there focused on *threshold* issues related to the Eighth Amendment's breadth, rather than jumping directly to the question of whether the fine at issue was excessive.

*Finally*, the concurrence argues that we must avoid resolving this "not . . . uncomplicated" "constitutional question[]." Concurrence at 1 n.1, 3 (internal quotation marks omitted). But it does not say what exactly is "complicated" about the issue here, which our caselaw appears to answer clearly. Nor does the

15

concurrence explain why the "constitutional" dimension of this case is relevant; in arguing that we must avoid even directly presented constitutional questions, the concurrence relies on precedent where the Supreme Court considered resolving "statutory claims" before reaching overlapping constitutional ones. *See id.* at 3 (citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 446 (1988)). This case, by contrast, tees up purely constitutional issues, including how far the Eighth Amendment stretches.[3]

We make one additional point: the concurrence appears to focus on prudential concerns related to "judicial restraint." *Id.* (internal quotation marks omitted). But we do not think prudence requires us to depart from the logical approach of addressing threshold questions before merits ones so as to "decide the cases before us." *Id.* (citing *United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, *J.*, concurring)). Courts are often faced with "successive questions," and how to sequence that analysis "is within the broad discretion judges have in constructing written opinions." *Spears v. Stewart*, 283 F.3d 992, 1005 (9th Cir. 2002)

---

[3] The concurrence also points to *Camreta v. Greene*, where the Supreme Court advised us against "turning small cases into large ones." Concurrence at 2–3 (quoting 563 U.S. 692, 707 (2011)). But *Camreta*'s main holding cuts in the *opposite* direction; indeed, in the very next sentence, the Supreme Court explained that it "is sometimes beneficial to clarify . . . legal standards" by reaching non-dispositive issues. 563 U.S. at 707 (noting that courts may "avoid avoidance"). Put simply, the avoidance of legal questions is not – as the concurrence implies – a virtue in its own right.

(Kozinski, *J.*, concurring in the denial of rehearing en banc).[4] Nor does addressing questions in their logical order make one answer dicta and the other holding. As the Supreme Court explained long ago, if a "point [is] properly presented and decided in the regular course of the consideration of the cause," the decision on that point "[is] in no just sense dictum," even if "something else [is] found in the end [that] dispose[s] of the whole matter." *Fla. Cent. R. Co. v. Schutte*, 103 U.S. 118, 143 (1880).

That rule makes sense. Holdings decide a case and "explain[] . . . the rules [of law] that govern th[at] decision." Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1256–57 (2006). By contrast, "a dictum consists essentially of a comment on how the court would decide some other, different case." *Id.* at 1256. Under this straightforward definition, the answer to a squarely presented "preliminary question[]" about whether a business entity is "protected by the Excessive Fines Clause" clearly qualifies as a holding –

---

[4] *See also* John O. McGinnis & Michael Rappaport, *An Originalist Approach to Prospective Overruling*, 99 Notre Dame L. Rev. 425, 465–66 (2023) (explaining that "a judicial conclusion that is part of a logical order for deciding an issue is not dictum but holding" because "the conclusions that the court reaches are part of an order of decision that is a logical method for deciding the case" and it is therefore "sensible to treat these conclusions as reasonable methods to actually decide the case rather than to decide matters that are not needed for the decision"); Michael C. Dorf, *Dicta and Article III*, 142 U. Pa. L. Rev. 1997, 2046 (1994) ("[S]urely a court should not be faulted for addressing issues in the order that they logically present themselves.").

not dictum. *Browning-Ferris*, 492 U.S. at 283. Far from speculating about "some other, different case," our holding resolves a threshold issue and provides a key link in our chain of analysis. Leval, *supra*, at 1256. And "[w]hen an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound"; that is because "the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (internal quotation marks omitted); *see also United States v. Johnson*, 143 F.4th 184, 191 (2d Cir. 2025) (Menashi, *J.*, concurring in the denial of rehearing en banc) ("The reasoning of a panel opinion binds a later panel even if the later panel can imagine a narrower rationale for the earlier decision.").

In other words, when we address a threshold issue, we do not create dicta just because we theoretically *could* have assumed the answer to that question without deciding it. Today, we must determine whether the County can impose a $4.8 million fine. To resolve that dispute, we proceed in logical order: first, we decide that the Excessive Fines clause applies to business entities; second, we decide whether the fine was excessive as applied to this entity. Both of these questions were "properly presented" in the litigation and have now been "decided

18

in the regular course of the consideration of the case." *Fla. Cent. R. Co.*, 103 U.S. at 143. Our decisions on those questions are therefore "in no just sense dictum." *Id.*

For all these reasons, and to provide needed guidance to district courts and future litigants, we today hold that the Eighth Amendment shields business entities – including trusts and corporations – from excessive fines.

### 2. The fine here was not excessive.

A fine is unconstitutionally "excessive" if it is "grossly disproportional to the gravity of [the] offense." *Viloski*, 814 F.3d at 110 (quoting *Bajakajian*, 524 U.S. at 334). To determine whether a fine is disproportional, we weigh the four "*Bajakajian* factors": "(1) the essence of the [offense] of the defendant and its relation to other [unlawful] activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum . . . fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct."[5] *Id.* (internal quotation marks omitted); *see also Bajakajian*, 524 U.S. at 336 ("[We] grant substantial deference to the broad authority that

---

[5] Although *Bajakajian* involved a criminal forfeiture, 524 U.S. at 328, we have previously applied the *Bajakajian* factors in civil cases, *Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582, 589 n.3 (2d Cir. 2024); *see also Oles v. City of New York*, 2023 WL 3263620, at *1 (2d Cir. May 5, 2023) (summary order) (analyzing constitutionality of parking fines), and neither side disputes that *Bajakajian* applies here.

legislatures necessarily possess in determining the types and limits of punishments for crimes." (quoting *Solem v. Helm*, 463 U.S. 277, 290 (1983))). The Trust's claim fails that test.

*First*, the "essence" of the Trust's conduct justified a significant penalty. Although this fine arises in the context of a civil penalty rather than a criminal prosecution, it still relates to misconduct that implicates the ability of county and municipal governments to assess and collect revenue. The Trust "knowingly and willfully," *United States v. Castello*, 611 F.3d 116, 121 (2d Cir. 2010), flouted the ASIE Law over the course of years – not because of "a spur of the moment decision" or a "momentary lapse of judgment," but as part of a "conscious . . . decision" to avoid compliance, *von Hofe v. United States*, 492 F.3d 175, 188 (2d Cir. 2007).

The Trust attempts to downplay its "level of culpability" by insisting that its failure to submit ASIE data was merely a "reporting offense" that did not involve other "illegal activities of any kind." Trust Br. at 28 (quoting *Bajakajian*, 524 U.S. at 337). But unlike in *Bajakajian*, where the statute at issue required reporting to track other criminal activity – which the defendant was not engaged in, 524 U.S. at 337–38 & n.13 – the reporting requirement here aimed expressly at compelling all commercial property owners to turn over certain data. The Trust's

20

disregard of the statute's purported goal of protecting the public fisc by helping the County develop "more accurate assessments," Sp. App'x at 51, thus makes its offense serious enough to merit a fine. Indeed, we have upheld penalties imposed for reporting offenses, even when the violator was "convicted of no other crime." *Castello*, 611 F.3d at 124 (ordering forfeiture of roughly $12 million); *see also United States v. George*, 779 F.3d 113, 122–24 (2d Cir. 2015) (affirming forfeiture of home based on defendant's harboring conviction, which the court characterized as "a deliberate and sustained thwarting of federal immigration law, which allowed her to exploit [immigrant] labor while ignoring federal wage and tax laws").

*Second*, the Trust fits "into the class of persons for whom the statute was principally designed." *Viloski*, 814 F.3d at 110 (internal quotation marks omitted). The ASIE Law aimed to "enhance compliance from" such "income[-]producing properties" as the Roosevelt Field Mall. Sp. App'x at 52 (quoting fiscal impact statement issued by Nassau County Legislature's Office of Legislative Budget Review). And while the Trust insists that – in hindsight – the particular ASIE data requested "could never be used to value large shopping malls," Trust Br. at 30, such retrospective attacks on the overall utility of a statute have no bearing on whether that statute targeted the entity being fined when it was enacted. The Trust

21

cannot dispute that, regardless of the ultimate usefulness of the ASIE data, the ASIE Law squarely aimed at commercial properties, including Roosevelt Field Mall.

*Third*, the fine was not grossly disproportional when compared to "the maximum . . . fine that could have been imposed." *Viloski*, 814 F.3d at 110 (internal quotation marks omitted). The Trust points out that an earlier version of the ASIE Law – enacted in 1984 – imposed a "mere $500 penalty," a far cry from the $4.8 million fine at issue here. Trust Br. at 32. But the third *Bajakajian* factor requires us to consider the maximum penalty available under the *current* statutory framework – not under a 1980s-era relic preferred by the entity being fined but rejected by the legislature itself. And the current ASIE Law keys fines to the fair market value of the underlying property and to the delinquency of the owner, scaling penalties from 0.25% up to 0.75% of the property's value depending on how long the owner takes to comply. Thus, by design, the fine here matched the value of the property, the corresponding importance of correctly assessing it, and the Trust's multiyear recalcitrance.

Furthermore, the fact that the penalty here was pegged to a percentage of the value of the property at issue does not itself violate the Excessive Fines Clause.

*See Ford Motor Credit Co. v. N.Y.C Police Dep't*, 503 F.3d 186, 190 n.7 (2d Cir. 2007) (upholding fine of 10% of value of seized and auctioned cars and explaining that "[w]hile there is cause for some concern over the poor correlation between the administrative costs the City likely incurs and the flat, ten-percent fee it charges secured creditors, we agree with the district court that the imposition of this fee does not violate the Eighth Amendment"); *San Huan New Materials High Tech, Inc. v. Int'l Trade Comm'n*, 161 F.3d 1347, 64 (Fed. Cir. 1998) (upholding fine after comparing it to "value of [patent] infringing magnets" and concluding that a fine of "three times th[at] value [was] well within constitutional limits"). The relatively low percentages Nassau County has applied – compared, for example, to New York City's five-percent-of-assessed-value fine, *see* N.Y.C. Administrative Code § 11-208.1(d)(1) – also suggest that the penalty is proportional, *see Grashoff v. Adams*, 65 F.4th 910, 919–20 (7th Cir. 2023) (considering "penalties for similar conduct" in other jurisdictions as "relevant evidence of legislative judgments about the seriousness of the offense").

*Finally*, "the nature of the harm caused by the defendant's conduct" also favors the fine imposed here. *Viloski*, 814 F.3d at 110 (internal quotation marks omitted). The Trust contends that its intentional decision to flout the law "affected

23

only the government," Trust Br. at 34, and it again points to *Bajakajian*, where the Supreme Court stressed that "[t]he harm that [the defendant] caused was . . . minimal" because it "affected only . . . the [g]overnment, and in a relatively minor way." 524 U.S. at 339. But this case does not resemble *Bajakajian*: there, the government had charged the defendant under a currency-reporting statute intended to foil "money launderer[s]," "drug trafficker[s]," and "tax evader[s]." *Id.* at 338. Because the defendant was not committing any of those crimes, he "deprived [the government] only of the information that [his cash] had left the country," *id.* at 339 – which, on its own, was of little interest to the government. Here, by contrast, the ASIE Law focuses specifically on collecting financial information from property owners to help the County produce "more accurate assessments." Sp. App'x at 51. By willfully refusing to supply that data, the Trust thwarted the statute's purpose, deprived the government of potentially useful information, and risked draining the public coffers.

In sum, the district court correctly upheld the ASIE fine. When the owner of a multi-hundred-million-dollar property is fined a fraction of one percent of the property's value for willfully and repeatedly refusing to comply with a law, it cannot complain that the penalty was "grossly disproportional" to its wrongdoing.

24

*Cf. United States v. Schwarzbaum*, 127 F.4th 259, 283–84 (11th Cir. 2025) (upholding several multimillion-dollar fines equal to 50% of value of unreported bank accounts because "Congress sought to deter precisely the harm for which [the defendant wa]s culpable, Congress considered that harm to be a very serious one, and Congress's method of deterring that harm is rational").

## B.     The Trust's Procedural-Due-Process Challenge Fails.

The Trust next contends that the district court erroneously rebuffed its procedural-due-process claim, which alleged that the County unconstitutionally imposed the fines at issue "without providing [the Trust] with any notice or an opportunity to challenge [them]." Trust Br. at 37. Again, we disagree.

The Fourteenth Amendment prohibits state governments from "depriv[ing] any person of . . . property[] without due process of law." U.S. Const. amend. XIV. To win on a procedural-due-process claim, a plaintiff "must be able to demonstrate (1) that [the d]efendants deprived [it] of a cognizable [property] interest . . . (2) without affording [it] constitutionally sufficient process." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017). While the parties spar over whether the Trust has been deprived of any property interest, we need not reach that issue because state law provided adequate process here.

25

To determine whether process is adequate, we consider the familiar factors set forth in *Mathews v. Eldridge*: (1) "the private interest" of the plaintiff; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest." 424 U.S. 319, 335 (1976). "[W]e [have] f[ound] that the second *Mathews* factor weighs dispositively in favor of the government," *N.Y. State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 168 (2d Cir. 2001) [hereinafter "*NYSNOW*"], when plaintiffs have timely access to the remedies available under Article 78 – an all-purpose statute that "provides both a hearing and a means of redress for petitioners," *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996).

There can be no dispute that the Trust had such access (and additional process) here. Before assessing ASIE fines, the County ordinarily sends letters to noncompliant property owners notifying them of the potential fines and providing an opportunity to cure. Should an owner claim not to have received that letter, the County confirms that the address on file for that owner is correct. If it is, and if the County persists in seeking to collect the fine, the property owner may then seek an injunction preventing enforcement of the fine under Article 78. "Given

26

the availability of [such] Article 78 procedures, which can be invoked *before* actual prejudice arises" (indeed, before the fine is ever collected), *NYSNOW*, 261 F.3d at 168, the process afforded here is "adequate," *Rivera-Powell v. NYC Bd. of Elections*, 470 F.3d 458, 466 (2d Cir. 2006) (Sotomayor, *J.*); *see Hellenic Am. Neighborhood Action Comm.*, 101 F.3d at 881.[6]

### C.     The Trust's Substantive Due Process Challenge Fails.

The Trust next contends that the ASIE Law "violated [its] substantive Due Process rights."  Trust Br. at 49.  We are not persuaded.

The Fourteenth Amendment "cover[s] a substantive sphere as well [as a procedural one], 'barring certain government actions regardless of the fairness of the procedures used to implement them.'"  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  But "[l]egislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality,"

---

[6] The parties also debate whether the alleged "failure to send [notice] letters" stemmed from "systemic" issues or was instead an "isolated incident."  Trust Br. at 45 (emphasis omitted).  In an enforcement action initiated by the County or in an Article 78 proceeding initiated to enjoin enforcement, the Trust would be able to challenge the fine on the ground that the County failed to send a notice letter.  Because the availability of that defense guarantees that a property owner will not be fined without notice and an opportunity to be heard – and therefore satisfies the Due Process Clause – we need not decide whether the County's conduct was systemic or isolated.  *Cf. Rivera-Powell*, 470 F.3d at 467.

and we will strike down such a law "only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose." *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997).

Here, the Trust contends that the ASIE Law "had no rational relationship to the claimed objective of improving assessments," and was in fact "aimed solely at revenue generation." Reply Br. at 22–23. The Trust notes that (i) "the prior $500 penalty achieved . . . compliance" rates comparable to the updated law's stiffer fines; (ii) the ASIE data that the law aimed to gather turned out to be "wholly useless[] for assessment purposes"; and (iii) the County subsequently passed an "Amnesty Law" allowing property owners to settle ASIE fines without submitting ASIE statements. *Id.* But to prevail on its substantive-due-process claim, the Trust must "discredit any conceivable basis [that] could be advanced to support the challenged provision, regardless of whether that basis has a foundation in the record or actually motivated the legislature." *Beatie*, 123 F.3d at 711 (citation omitted). Furthermore, the Trust's retrospective quibbles with the ASIE Law do not make it unconstitutional: "litigants may not procure invalidation of . . . legislation merely by tendering evidence in court that the legislature was mistaken." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981). When it

28

enacted the ASIE Law, the County "legislature *could* rationally have decided that the statute would fulfill [its] intended purpose," *Catlin v. Sobol*, 93 F.3d 1112, 1120 (2d Cir. 1996) (emphasis added), of helping the County produce "more accurate assessments," Sp. App'x at 70 (internal quotation marks omitted). That is all that rational basis review requires.[7]

**D.    The District Court Correctly Denied the Trust's Sanctions Motion.**

Finally, the Trust argues that the district court incorrectly denied its sanctions motion, which was based on its allegations of misconduct by the County and its officers in their characterizations of the ASIE Law and the storage of ASIE data. But while federal courts have the "inherent power . . . to levy sanctions in response to abusive litigation practices," *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980), the party seeking sanctions for fraud must show "clear and convincing evidence of bad faith," *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020).

The Trust has failed to make that showing here. Instead, it merely points to disputed facts regarding whether (i) one of Defendants' deponents incorrectly

---

[7] "[B]ecause all of [the Trust's] federal claims were properly resolved, the district court did not err in declining to exercise supplemental jurisdiction over any [of its] state[-]law claim[s]." *Russo v. Patchogue-Medford Sch. Dist.*, 129 F.4th 182, 187 (2d Cir. 2025); *see also* 28 U.S.C. § 1367.

represented his after-the-fact sense of the usefulness of the ASIE data, and (ii) another deponent mischaracterized the County's data-security protocols. Having carefully reviewed the record below, we cannot say that the district court abused its discretion in concluding that these "potential (ingenuine) disputes" related only to "certain (immaterial) facts" on which it did not rely "in ruling upon the summary judgment [c]ross-[m]otions." Sp. App'x at 76–77; *see also Yukos Cap.*, 977 F.3d at 235 (explaining that "our review is highly deferential" because district courts enjoy wide discretion in this area).

### III.   CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court granting Defendants' motion for summary judgment and denying the Trust's motion for sanctions.

RICHARD C. WESLEY, Circuit Judge, *concurring in part*:

I concur in the panel's fine opinion, except as to Section II.A.1, which concludes that the Eighth Amendment's Excessive Fines Clause protects corporations. Because we need not decide that issue to resolve this appeal, I would leave that question for another day.

In this appeal, the Retail Property Trust (the "Trust")—a Massachusetts business trust—challenges a fine imposed by Nassau County, arguing, among other things, that the fine runs afoul of the Excessive Fines Clause. Neither we nor the Supreme Court has determined whether that Clause applies to corporations or trusts.[1]

Noting the dearth of guidance on the issue, the magistrate judge assumed without deciding that the Clause applied, resting her recommendation on the fact that, regardless, the fine was not excessive. The district judge adopted that

---

[1] None of our sister circuits have resolved this issue, either. *See United States v. Chaplin's, Inc.*, 646 F.3d 846, 851 n.15 (11th Cir. 2011) (assuming but not deciding that Eighth Amendment applies to corporations); *United States v. Pilgrim Mkt. Corp.*, 944 F.2d 14, 22 (1st Cir. 1991) ("We will assume for purposes of our discussion that the eighth amendment proscription against excessive fines applies to corporations, although this is a very tenuous assumption."). Indeed, the question— notwithstanding our previous decision holding that the Bill of Attainder Clause protects corporations, *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 346–349 (2d Cir. 2002)—is not an uncomplicated one. As the majority notes, Maj. Op. at 9, "[w]hether or not a particular [constitutional] guarantee" protects corporations "depends on the *nature, history, and purpose* of the *particular* constitutional provision," *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 778 n.14 (1978) (emphases added).

recommendation without discussing the Clause's applicability. After the Trust appealed, the issue was raised by the Appellees as an alternative ground on which we might affirm the decision below.[2] The Trust replied, reasonably, that the Appellees' argument was "unfounded" because the Trust is not a corporation but a Massachusetts business trust. Trust's Rep. Br. at 7. It then devoted approximately one page of its reply to an argument that the Clause broadly applies to corporations.

Today, we "agree with the district court across the board" and "affirm the judgment in full." Maj. Op. at 4. Yet the majority takes a step beyond the course so ably charted by the judges below by engaging with a scarcely briefed question.[3] I see no need to decide that issue, for even if it is resolved in the Trust's favor, we must still affirm the result reached below. This approach is not novel. *See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 n.22 (1989) ("Because of the result we reach today, we need not answer several questions that

---

[2] The Appellees also made this argument before the district court.

[3] There may not be any reason to distinguish the Excessive Fines Clause's applicability to corporations from its applicability to Massachusetts business trusts. But both the parties' appellate briefs and the majority opinion fail to analyze that question in any detail, leaving unattended any relevant differences in the forms under state law. *See Swartz v. Sher*, 344 Mass. 636, 639 (1962) (stating that a business trust is "in many respects similar to a corporation" but that "such trusts are not corporations, nor are they entities apart from the trustees").

otherwise might be necessarily antecedent to finding the Eighth Amendment's Excessive Fines Clause applicable to an award of punitive damages, and that have not been briefed by the parties. We shall not decide whether the Eighth Amendment's prohibition on excessive fines applies to the several States through the Fourteenth Amendment, nor shall we decide whether the Eighth Amendment protects corporations as well as individuals."); *see also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); *Camreta v. Greene*, 563 U.S. 692, 707 (2011) ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").

Our job, as I see it, is to do no more or less than decide the cases before us. *See United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, *J.*, concurring), *aff'd*, 449 U.S. 424 (1981). Ultimately, what is dicta and what is holding here is not for me—or any member of this panel—to resolve. That is a question for a future panel; I leave it in their capable hands.